# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 22, 2009          Decided March 12, 2010

No. 07-1425

CABLEVISION SYSTEMS CORPORATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

AT&T INC. AND VERIZON,
INTERVENORS

---

Consolidated with 07-1487

---

On Petitions for Review of an Order
of the Federal Communications Commission

---

*Henk Brands* argued the cause for petitioners. With him on the briefs were *David P. Murray* and *Howard J. Symons*.

*Nandan M. Joshi*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Thomas O. Barnett*, Assistant Attorney General, U.S. Department of Justice, *Catherine G. O'Sullivan* and *Nancy C.*

*Garrison*, Attorneys, *Matthew B. Berry*, General Counsel, Federal Communications Commission, *Joseph R. Palmore*, Deputy General Counsel, and *Daniel M. Armstrong*, Associate General Counsel. *Richard K. Welch*, Deputy Associate General Counsel, entered an appearance.

*Helgi C. Walker* argued the cause for intervenors Verizon, et al. With her on the brief were *Michael E. Glover*, *Edward Shakin*, *William H. Johnson*, *Eve Klindera Reed*, *Christopher M. Heimann*, *Gary L. Phillips*, *Lynn R. Charytan*, *Jack N. Goodman*, *Heather M. Zachary*, *Dileep S. Srihari*, and *Pantelis Michalopoulos*.

*Harry F. Cole* was on the brief for *amicus curiae* Broadband Service Providers Association in support of respondents.

Before: SENTELLE, *Chief Judge*, GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

SENTELLE, *Chief Judge*: In these consolidated cases, Cablevision Systems Corporation and Comcast Corporation petition for review of the Federal Communications Commission's decision to extend for five years a statutory prohibition against exclusive contracts between cable operators and cable affiliated programming networks. Petitioners assert that the Commission misinterpreted the plain meaning of the underlying statute. In addition, they argue the Commission's decision was arbitrary and capricious and therefore violates the Administrative Procedure Act (APA). Lastly, petitioners claim the decision fails under First Amendment intermediate scrutiny.

We hold that the Commission's interpretation of its statutory mandate was reasonable. Because we also hold that the Commission's decision satisfies arbitrary and capricious review, and that intermediate scrutiny is not applicable, we deny the petitions for review.

## I. Background

Multichannel video programming distributors (MVPDs), such as cable television operators or direct broadcast satellite providers, offer customers multiple channels of video programming, generally by subscription. From the 1940s when the first cable television systems were built until the 1990s, the cable industry dominated this market. In most geographic areas, cable operators were the only MVPDs, often enjoying local cable monopolies because they were permitted to enter into exclusive local franchises when they laid cables using public rights of way and easements. As the market for cable subscriptions grew, so did the market for cable programming to supplement television broadcast programming. Cable programmers began to develop programs for sale or license to cable operators. These two halves of the cable industry often had — and still have — overlapping ownership, with cable operators having ownership interests in cable programmers, and vice versa. Such companies constitute "vertically integrated" entities.

In 1990, the Federal Communications Commission reported to Congress that the cable operators' monopolies in the MVPD market persisted partly because competitors were unable to secure programming owned by vertically integrated cable companies. *Competition, Rate Deregulation and the Commission's Policies Relating to the Provision of Cable Television Service*, 5 F.C.C.R. 4962, 5006–08 (1990). In response to the Commission's report, Congress enacted the

Cable Television Consumer Protection and Competition Act of 1992 (Cable Act). Pub. L. No. 102-385, 106 Stat. 1460. Section 628 of the Act, 47 U.S.C. § 548, prohibits various activities that inhibit competition in video programming. One provision, § 628(c)(2)(D), directs the Commission to promulgate regulations prohibiting exclusive contracts for cable and broadcast programming between a cable operator and a cable programming vendor in which a cable operator has an attributable interest, unless the Commission determines that the contract would be in the public interest. This provision ("the exclusivity prohibition") applies to programming delivered to distributors via satellite, the most common method of delivery, but not to programming delivered by terrestrial lines such as fiber optic cables. The exclusivity prohibition was subject to a sunset provision, which provided that the exclusivity prohibition would lapse ten years after the date of the Cable Act's enactment, "unless the Commission finds, in a proceeding conducted during the last year of such 10-year period, that such prohibition continues to be necessary to preserve and protect competition and diversity in the distribution of video programming." 47 U.S.C. § 548(c)(5).

At the end of the ten year period, in 2002, the Commission extended the exclusivity prohibition for five years with a commitment to evaluate the market again at the end of the five years. In its analysis, the Commission concluded that the prohibition was "necessary" "if, in the absence of the prohibition, competition and diversity would not be preserved and protected." *Implementation of the Cable Television Consumer Protection and Competition Act of 1992 and Development of Competition and Diversity in Video Programming Distribution: Section 628(c)(5) of the Communications Act – Sunset of Exclusive Contract Prohibition*, Report and Order, 17 F.C.C.R. 12,124, 12,128-30 (2002). Though competition in the multichannel video programming

market had improved significantly since 1992, the Commission found that conditions had not changed enough to allow the prohibition to sunset.

Over the next five years, the markets for both multichannel video programming distribution and programming creation continued to change dramatically. When the Commission compiled its report on the state of the MVPD market in 2007, it recorded many differences between the 2002 and 2007 markets. *Implementation of the Cable Television Consumer Protection and Competition Act of 1992 and Development of Competition and Diversity in Video Programming Distribution: Section 628(c)(5) of the Communications Act – Sunset of Exclusive Contract Prohibition*, Report and Order and Notice of Proposed Rulemaking, 22 F.C.C.R. 17791 (2007) ("2007 Order"). As of 2007, there were 531 national programming networks, up from 294 in 2002 and just 68 in 1992. The percentage of those networks that were vertically integrated decreased to 22 percent from 35 percent in 2002 and 57 percent in 1992. However, many of the most popular networks were still cable affiliated; seven of the Top 20 satellite-delivered networks as ranked by prime time ratings, and almost half of all regional sports networks, were affiliated with the four largest cable operators, Comcast, Time Warner, Cox, and Cablevision.

The cable delivery market also changed significantly. At the time of the Order, cable operators controlled 67 percent of multichannel video programming distribution, down from 78 percent in 2002 and 95 percent in 1992. Direct broadcast satellite operators such as DirecTV and EchoStar served 30 percent of the market, up from 18 percent in 2002. Since 2002, telephone companies have begun offering wireline services based on their telephone infrastructure. While wireline competitors only represent a small share of the MVPD market, they represent a potentially powerful force because they can

offer the same bundled voice, broadband data, and video services that cable operators provide but that direct broadcast satellite cannot offer.

To monitor the geographic variations in the television market, the Commission designates geographic television markets, called "designated market areas," based on local viewing patterns. Each county in the United States is allocated to a market based on which stations receive a preponderance of total viewing hours in the county. 2007 Order at 17,828 n.276. Examining these designated market areas individually, the Commission noticed that in many areas consumers continue overwhelmingly to subscribe to cable. Cable operators tend to cluster regionally, and over the years smaller operators have consolidated with large operators. Because of this clustering and consolidation, a single geographic area can be highly susceptible to near-monopoly control by a cable company. The four largest cable operators have in fact increased their share of the national MVPD market from 48 percent in 2002 to between 53 and 60 percent in 2007.

In the 2007 Order, the Commission also assessed the incentives of vertically integrated cable companies to withhold programming from competitors. In order to make this evaluation, the Commission extrapolated from exclusive contracts that are allowed to and do exist. *See* 2007 Order, App'x C, 22 F.C.C.R. at 17,883. Because the exclusivity prohibition only applies to programming delivered to distributors via satellite, vertically integrated cable companies can and do enter into exclusive contracts for programming to be delivered through terrestrial cables. These programming networks tend to be regional, such as Comcast SportsNet Philadelphia or CN8, a Comcast-owned local news and information channel serving 20 television markets. Comcast currently withholds its SportsNet Philadelphia network from

competitors, and the FCC used this example as a case study to reverse engineer what market conditions make withholding profitable. The Commission then extrapolated from these data to predict how many satellite-delivered regional and national networks would be withheld by vertically integrated cable companies if the prohibition lapsed. Depending on the values for certain variables – including whether subscribers who switch from a competitor sign up for cable service alone or for bundled services such as phone and internet services – somewhere between 26 and 59 market areas would be susceptible to withholding of a regional network owned by Time Warner or Comcast.

For popular national networks, withholding could be profitable for Comcast if as few as 1.9 percent of competitors' subscribers switched to the affiliated cable operator, assuming ideal conditions for the cable company. However, if the popular national network were owned by Time Warner and new subscribers only bought video services, the required amount of switching might be as high as 63.6 percent of competitors' customers. *Id.* at 17,890-91. Given these calculations, the Commission concluded that, at least in some circumstances, vertically integrated cable companies would enter into exclusive contracts for programming if they were allowed to. Though it acknowledged that exclusive contracts sometimes can be beneficial for competition and consumers, the Commission stated that it did not believe "that these purported benefits [would] outweigh the harm to competition and diversity in the video distribution marketplace that would result if we were to lift the exclusive contract prohibition." *Id.* at ¶ 63, 22 F.C.C.R. at 17,835. Given its observations of the market and predictions about the effect of lifting the prohibition, the Commission ultimately decided that the prohibition remained necessary under its 2002 Order definition of that term in the sunset provision. The Commission therefore extended the prohibition for another

five years with a possibility for an earlier review if the market changed rapidly. *Id.* at ¶ 1, 22 F.C.C.R. at 17,792.

Petitioners Cablevision and Comcast subsequently filed petitions for this Court to review the 2007 Order.

## II. Analysis

### A. Standard of Review

The Commission's interpretation of its statutory mandate must satisfy the two step test under *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Under step one, if a statute "has directly spoken to the precise question at issue," *id.* at 842, the court and the agency "must give effect to the unabiguously expressed intent of Congress," *id.* at 843. Under step two, when the statute is silent or ambiguous, the court asks "whether the agency's answer is based on a permissible construction of the statute." *Id.*

We review the Commission's decisionmaking process under the Administrative Procedure Act. 5 U.S.C. § 706. We will vacate an agency's decision as arbitrary and capricious "if [its] factual determinations lack substantial evidence," *Pan-Alberta Gas, Ltd. v. F.E.R.C.*, 251 F.3d 173, 176 (D.C. Cir. 2001), or if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 753 (D.C. Cir. 2007) (quoting *Motor Vehicle Mfrs Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). However, we will not substitute our judgment for the agency's, especially when, as

here, the decision under review requires expert policy judgment of a technical, complex, and dynamic subject. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1002-03 (2005).

Petitioners argue that we must also evaluate the 2007 Order under First Amendment intermediate scrutiny because, they contend, forcing a company to share programming it owns or creates discourages and impedes free speech. The First Amendment standard would require the Commission's decision to draw "reasonable inferences based on substantial evidence," *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994) (plurality). Under intermediate scrutiny, the Commission's findings of fact would not warrant the same degree of deference as under the APA alone. The government would need to show that its restriction of speech is narrowly tailored to an important governmental interest, rather than rely on the deference we generally afford agencies. *See United States v. Doe*, 968 F.2d 86, 90 (D.C. Cir. 1992) ("Where constitutionally protected activity is implicated, we cannot simply defer to the [agency]. . . .").

This Court analyzed the exclusivity prohibition under First Amendment intermediate scrutiny once before. In *Time Warner Entertainment Co., L.P. v. F.C.C.*, 93 F.3d 957 (D.C. Cir. 1996), we considered a facial challenge to the constitutionality of several parts of the Cable Act, including the exclusivity provision. In deciding what level of scrutiny to apply, we looked to the Supreme Court's decision in *Turner Broadcasting System*, which held that rules requiring cable systems to carry certain local commercial television stations and noncommercial education stations were subject to intermediate scrutiny. 512 U.S. at 643. Applying the *Turner* Court's logic to the exclusivity provision, we held that the rule is "likewise 'justified by special characteristics' of the affected companies: both 'the

bottleneck monopoly power exercised by cable operators,' and the unique power that vertically integrated companies have in the cable market." *Time Warner*, 93 F.3d at 978 (quoting *Turner*, 512 U.S. at 661) (citations omitted). We therefore held intermediate scrutiny to be the appropriate standard to apply, noting that the provision is content-neutral on its face because it "regulat[es] cable programmers and operators on the basis of the 'economics of ownership,' a characteristic unrelated to the content of speech." *Id.* at 977 (quoting *Daniels Cablevision, Inc. v. United States*, 835 F.Supp. 1, 7 (D.D.C. 1993)). Under intermediate scrutiny, a court must uphold a statutory provision if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). Applying that standard, we held the exclusivity prohibition to be facially constitutional. *Id.* at 979.

Because it addressed only a facial challenge to the provision, *Time Warner* left open the possibility of a future as-applied challenge. However, petitioners here do not actually present that challenge. Instead, they merely invoke the terminology of First Amendment scrutiny in passing, and hope that we find the exclusivity prohibition's burden on MVPDs so heavy and so unnecessary that an as-applied challenge appears on its own. We refuse to manufacture an as-applied challenge for the petitioners, and therefore are left with only a facial challenge. For that issue, we simply refer to our decision in *Time Warner*. We therefore find it unnecessary to evaluate the 2007 Order under the intermediate scrutiny standard.

Our dissenting colleague is able to tease out references to the First Amendment from petitioners' arguments. *See*

Dissenting Op. at 4–8. Notwithstanding these mentions of the Amendment, petitioners fail to make a specific, as-applied challenge that distinguishes their current arguments from the ones we already rejected in the facial challenge in *Time Warner*. In this case, in providing the required Statement of Issues in its brief, petitioners set forth the following:

    I.    Whether the FCC misapprehended the standard governing the circumstances under which it may prevent the exclusivity rule from sunsetting.

    II.    Whether, under the correct standard, the FCC was required to allow the exclusivity rule to sunset.

    III.    Whether the FCC erred in refusing to narrow the exclusivity rule.

    IV.    Whether the order under review should be vacated.

Pet. Br. at 3. Conspicuously, petitioners' recitation of the issues before the court makes no mention of constitutionality. "Federal courts should not decide constitutional questions unless it is necessary to do so," *Kalka v. Hawk*, 215 F.3d 90 (D.C. Cir. 2000) (citing *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)), nor should they "decide [a] constitutional question unless it is 'presented with the clarity needed for effective adjudication,'" *U.S. v. Byers*, 740 F.2d 1104, 1128 (D.C. Cir. 1984) (quoting *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 587 n.2 (1972)). It is hardly necessary for us to decide an issue of constitutionality which petitioner does not even set forth as an issue in the case and to which it refers only obliquely.

**B. Merits**

Petitioners object to three conclusions made by the Commission in reaching its decision to prolong the exclusivity prohibition. First, the Commission decided to continue to use its 2002 interpretation of the proper standard of review dictated by the statutory sunset clause. Second, the Commission concluded that cable companies would most likely enter into competition-hindering exclusive contracts if allowed to do so. The Commission came to this conclusion using calculations extrapolated from information about existing exclusive contracts for non-satellite delivered programming. Finally, the Commission considered and decided against changing the scope of the prohibition to allow certain types of currently prohibited exclusive contracts.

*i. Statutory Interpretation*

As noted above, the sunset provision of the Cable Act dictates that the exclusivity prohibition shall cease "unless the Commission finds . . . that such prohibition continues to be necessary to preserve and protect competition and diversity in the distribution of video programming." 47 U.S.C. § 548(c)(5). Petitioners first argue that the 2007 Order applied the wrong definition of "necessary." The term, however, "is not language of plain meaning." *Cellco P'ship v. F.C.C.*, 357 F.3d 88, 97 (D.C. Cir. 2004). Depending on context, the term can mean anything from "useful" or "convenient" to "indispensable" or "essential." The statutory language of the sunset provision gives little guidance on which definition is most appropriate. Here, the Commission decided to use the same interpretation it used in 2002: the prohibition continues to be necessary "if, in the absence of the prohibition, competition and diversity in the distribution of video programming would not be preserved and protected." 2007 Order at ¶ 13, 22 F.C.C.R. at 17,801. This

interpretation is well within the Commission's discretion to interpret statutory language under *Chevron*.

Petitioners also argue that the 2007 Order misinterprets the mandate to preserve and protect competition as a requirement to protect competitors, analogizing the Commission's current analysis to its faulty analysis vacated in *AT&T Corporation v. Iowa Utilities Board*, 525 U.S. 366 (1999). In that case, the statutory language at issue required telephone companies to share their networks with competitors whenever failure to do so would "impair" competitors' ability to provide service. The Commission interpreted the provision to require sharing whenever a failure to share would result in *any* increase in cost, decrease in quality, or delay to providing services. The Supreme Court held this interpretation invalid because the statute clearly envisioned that some sharing would not be required, but the Commission's interpretation would result in requiring any and all sharing that would be at all useful to competitors. However, the order before us is easily distinguishable from the one reviewed in *Iowa Utilities Board*. There, the Commission explicitly stated a standard that equated impairing competitors with any lack of sharing. Here, the Commission's order discusses harm to consumers and competition that results from harm to competitors, rather than incorrectly believing one harm to be equivalent to the other. *See, e.g.*, 2007 Order ¶ 40, 22 F.C.C.R. at 17,819 (explaining that withholding programming from rivals can significantly impact subscribership, which can "*in turn*, predictably harm competition and diversity in the distribution of video programming, to the detriment of consumers" (emphasis added)); *id.* at ¶ 53, 22 F.C.C.R. at 17,829 ("In the long term, a withholding strategy may result in a reduction in competition . . . , thereby allowing the affiliated cable operator to raise rates."). While the Order does often measure effects on MVPDs rather than directly measuring consumer effects, the Commission sufficiently linked the two to

justify its conclusion that market conditions do not yet warrant letting the exclusivity prohibition lapse. We trust that the Commission was sincere when it explicitly anticipated that a market may develop in which exclusive programming could exist but not be harmful to competition, and "caution[ed] competitive MVPDs to take any steps they deem appropriate to prepare for the eventual sunset of the prohibition." 2007 Order at ¶ 29, 22 F.C.C.R. at 17,810.

*ii. Decisionmaking Process*

Petitioners' second contention is that the Commission did not rely on substantial evidence when it concluded that vertically integrated cable companies would enter into competition-harming exclusive contracts if the exclusivity prohibition were allowed to lapse. Noting that conclusions based on FCC's predictive judgment and technical analysis are just the type of conclusions that warrant deference from this Court, we disagree with petitioners' characterization of the 2007 Order.

It is true that the MVPD market has transformed substantially since the Cable Act was enacted in 1992. However, as described above, the transformation presents a mixed picture. While cable no longer controls 95 percent of the MVPD market, as it did in 1992, cable still controls two thirds of the market nationally. In designated market areas in which a single cable company controls a clustered region, market penetration of competitive MVPDs is even lower than nationwide rates. 2007 Order at ¶ 55, 22 F.C.C.R. at 17,830.

The amount and diversity of programming has expanded rapidly, giving MVPDs more programming options even if one network were unavailable to them because of an exclusive contract. However, the four largest cable operators are still

vertically integrated with six of the top 20 national networks, some of the most popular premium networks, and almost half of all regional sports networks. The Commission believes the ability and incentive for vertically integrated cable companies to withhold "must-have" programming remains substantial enough to require the further extension of the exclusivity prohibition. We must defer to the Commission's analysis.

It is also true that the Commission's calculations on the likelihood of future withholding appear susceptible to questions about their predictive power. What is true about Comcast SportsNet Philadelphia may not be equally true for all regional networks and even less true for national networks, yet the Commission still used that one station as the basis for much of its analysis. But predictive calculations are a murky science in the best of circumstances, and the Commission naturally has no access to infallible data about the nature of contracts that do not exist. "[W]e do not sit as a panel of referees on a professional economic journal, but as a panel of generalist judges obliged to defer to a reasonable judgment by an agency acting pursuant to congressionally delegated authority." *City of Los Angeles v. U.S. Dep't of Transp.*, 165 F.3d 972, 977 (D.C. Cir. 1999). The Commission has recognized and analyzed complicated pictures of the MVPD market both current and projected. These data qualify as substantial evidence for arbitrary and capricious review. The Commission's decision does not run counter to the evidence, nor is it implausible or irrational. *See Mount Royal Joint Venture*, 477 F.3d at 753; *Center for Auto Safety v. Peck*, 751 F.2d 1336, 1373 (D.C. Cir. 1985). In short, it is not arbitrary and capricious.

We anticipate that cable's dominance in the MVPD market will have diminished still more by the time the Commission next reviews the prohibition, and expect that at that time the Commission will weigh heavily Congress's intention that the

exclusive contract prohibition will eventually sunset. Petitioners are correct in pointing out that the MVPD market has changed drastically since 1992. We expect that if the market continues to evolve at such a rapid pace, the Commission will soon be able to conclude that the exclusivity prohibition is no longer necessary to preserve and protect competition and diversity in the distribution of video programming.

Petitioners' last criticism of the 2007 Order is that the Order failed to narrow the exclusivity rule to apply only to certain types of cable companies or certain types of programming. While the current rule includes a procedure for obtaining an exemption from the prohibition on a case by case basis, petitioners claim that this procedure is not sufficient to save the rule from being invalid because it still prohibits more exclusive contracts than is absolutely necessary to preserve and protect competition and diversity in the market. During the notice and comment period for the 2007 Order, petitioners offered several suggestions for narrowing the rule, each of which the Commission rejected. It was not arbitrary and capricious for the Commission to reject these suggestions and decide instead to adhere to Congress's statutory design. Because we hold that the Commission was reasonable in its conclusion that the prohibition – in its original form – continues to be necessary, we also hold that the Commission was reasonable to keep the same prohibition in that same form.

For the reasons set forth above, the petitions for review are

*Denied*.

KAVANAUGH, *Circuit Judge*, dissenting:

I respectfully dissent. Approved by the required two-thirds of the House and Senate in 1789 and ratified by three-quarters of the state legislatures by 1791, the text of the First Amendment to the Constitution is straightforward and expansive: "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. CONST. amend. I. The First Amendment endures, and it applies to modern means of communication as it did to the publishers, pamphleteers, and newspapers of the founding era. The Supreme Court has repeatedly ruled that video programming distributors (such as Comcast, DIRECTV, DISH, Time Warner, Cablevision, Verizon, and AT&T) and video programming networks (TNT, ESPN, Fox News, MSNBC, and several hundred others) are editors and speakers protected by the First Amendment's guarantees of freedom of speech and of the press. Under Supreme Court precedent, the Government may adopt a content-neutral regulation interfering with those entities' First Amendment rights only if the regulation furthers an "important" or "substantial" government interest and the restriction on speech is "no greater than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994) (articulating First Amendment intermediate scrutiny standard).

Two decades ago, local cable operators maintained bottleneck monopolies over video programming distribution and provided the only way most consumers could access and view video programming networks. To prevent abuses of the cable operators' monopoly power, Congress enacted the 1992 Cable Act. The statute imposed forced-carriage requirements on cable operators (known as must-carry, leased-access, and channel-occupancy) and placed forced-sharing mandates on cable programming networks (by banning exclusive contracts between cable operators and their affiliated video

programming networks). The Supreme Court and this Court upheld various provisions of the Act against First Amendment facial challenges. *See Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 224 (1997); *Turner*, 512 U.S. at 666-68; *Time Warner Entm't Co. v. FCC*, 93 F.3d 957, 979 (D.C. Cir. 1996). In so doing, the courts were careful to explain, however, that the restrictions on the editorial and speech rights of cable operators and programmers were permissible on their face only because of the "bottleneck monopoly power exercised by cable operators." *Turner*, 512 U.S. at 661; *Time Warner*, 93 F.3d at 978.

Since the 1992 Cable Act and those mid-1990s cases, the video programming market has changed dramatically. Cable operators no longer possess bottleneck monopoly power. Today, almost every home consumer has the choice of at least three video programming distributors – DIRECTV, DISH, and the local cable operator (usually Comcast, Time Warner, Cox, Charter, or Cablevision). Many consumers can choose a fourth or sometimes also a fifth video programming distributor, Verizon FiOS or AT&T U-verse. Moreover, all video programming distributors – including individual cable operators – compete against one another in the upstream market in which the distributors contract with national programming networks. At the same time, the number of national video programming networks has also expanded tremendously, growing from about 70 in 1992 to well over 500 today, with only about 22 percent now affiliated with a video programming distributor. On top of all that, many consumers today obtain video programming through a variety of Internet applications, such as YouTube and Hulu.

The nearly two-decade-old FCC rule at issue in this case bars exclusive contracts between cable operators and

affiliated cable programming networks. The rule is essentially a forced-sharing mandate that compels cable video programming networks to share their content with all video programming distributors. The original purpose was to prevent bottleneck monopoly cable operators from thwarting the development of competing video programming distributors; the fear was that cable operators would deny nascent video programming distributors access to cable-affiliated programming networks. We upheld this requirement on its face in *Time Warner* in 1996. But in today's competitive market, the justification we accepted in *Time Warner* – counteracting the "bottleneck monopoly power" of cable operators – has collapsed. Cable operators no longer possess bottleneck monopoly power in the video distribution market, a point we made rather emphatically just a few months ago. *See Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009). The FCC's exclusivity ban thus is no longer necessary to further competition – and no longer satisfies the intermediate scrutiny standard set forth by the Supreme Court for content-neutral restrictions on editorial and speech rights. I would hold that the FCC's exclusivity rule violates the First Amendment, and thus also violates the 1992 Cable Act as construed to conform to the First Amendment. I respectfully dissent.

I

The initial question is whether Cablevision has raised any First Amendment issue in this case. The majority opinion states that Cablevision has not. *See* Maj. Op. at 10. It proceeds to treat this as a purely statutory/administrative law case, raising only the question whether the FCC's five-year extension of the exclusivity ban is still "necessary" for purposes of the 1992 Cable Act. I respectfully disagree with

the majority opinion's characterization of Cablevision's argument.

The statutory standard governing the FCC's decision gives the Commission broad discretion to determine whether the ban is still "necessary." 47 U.S.C. § 548(c)(5). No doubt recognizing the difficulty in establishing that the FCC's exclusivity rule violates that rather flexible statutory text, *cf. Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984), or of showing a violation of the deferential APA arbitrary and capricious standard, Cablevision expressly argued in its briefs and at oral argument that we cannot resolve this case without regard to the relevant First Amendment limits.

In its opening brief, for example, Cablevision contended that:

- "[T]he exclusivity rule imposes a heavy burden on First Amendment rights – a burden that should be limited to instances where it is essential." Cablevision Br. at 23-24.

- "As the FCC acknowledged, the order under review is also subject to intermediate First Amendment scrutiny. The exclusivity rule imposes an onerous burden on cable-affiliated video-programming services: it requires them to speak when they would prefer to remain silent. It thereby diminishes the incentive to engage in speech in the first place, reducing output in the marketplace of ideas." *Id.* at 32 (footnotes omitted).

- "Intermediate First Amendment scrutiny poses a standard that is similar to, but more exacting than, that of the APA." *Id.*

- "In particular, where intermediate scrutiny applies, the agency bears the burden in every respect. It must demonstrate that any predicted harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way. The FCC must build a record that convincingly shows a problem to exist. In doing so, the FCC must draw reasonable inferences based on substantial evidence. The FCC's findings of fact are not entitled to deference. To the extent predictions are susceptible of empirical proof, they must be so proven. Where there is no evidence of any urgent need for preventive action, the agency is not entitled to the benefit of the doubt." *Id.* at 33-34 (internal quotation marks and footnotes omitted).

- "The First Amendment also colors the reading of the text of the statute: any statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score. It is further well established that, where an agency's reading would generate significant constitutional doubt, that reading is not entitled to *Chevron* deference." *Id.* at 34 (internal quotation marks and footnote omitted).

In its opposition brief, even the FCC recognized that Cablevision had raised a First Amendment argument:

- "To the extent the Commission's decision to extend the exclusivity prohibition implicates the First Amendment, it is subject to review under the intermediate-scrutiny standard. A regulation will be upheld under intermediate scrutiny if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests. In applying intermediate scrutiny to federal statutes, the courts inquire not whether Congress, as an objective matter, was correct that the regulatory provision is necessary to achieve the government's objective, but rather whether the legislative conclusion was reasonable and supported by substantial evidence in the record before Congress. As applied to the Commission's predictive judgment, the intermediate-scrutiny standard considers whether the agency has drawn reasonable inferences based on substantial evidence." FCC Br. at 23-24 (citations and internal quotation marks omitted).

- "Petitioners also briefly invoke the First Amendment. It is true that, under the canon of constitutional avoidance, a statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score. To invoke the canon, however, the petitioner must show one of those constructions creates a serious likelihood that the statute will be held unconstitutional. Petitioners have made no such showing. Their back-door constitutional attack on the exclusivity prohibition thus fares no better than the facial attack on the statute that this Court has already

rejected." *Id.* at 31-32 (citations and internal quotation marks omitted).

Responding to the FCC's treatment of its First Amendment challenge, Cablevision's reply brief argued:

- "*Finally*, the FCC disagrees that the First Amendment tugs toward the 'essential' side of the spectrum. According to the FCC, constitutional considerations would affect the interpretation of the statute only if a 'useful' interpretation would create a serious likelihood that the statute would be unconstitutional. But, under intermediate scrutiny (which the FCC agrees applies), the agency bears the burden of demonstrating that the challenged regulation will in fact alleviate non-conjectural harms in a direct and material way. That formulation points to a 'necessary' standard: a 'useful' standard would risk perpetuating the exclusivity rule even where it does not alleviate harm to competition in a direct and material way." Cablevision Reply Br. at 9 (citations, internal quotation marks, and footnote omitted).[1]

At oral argument, Cablevision further elaborated on its constitutional claim:

---

[1] In its 2007 order extending the ban, the FCC similarly acknowledged the First Amendment issues raised by the exclusivity ban: "We are mindful that our decision to extend the exclusive contract prohibition must withstand an intermediate scrutiny test pursuant to First Amendment jurisprudence." *Implementation of the Cable Television Consumer Protection and Competition Act of 1992*, 22 F.C.C.R. 17,791, 17,837 (2007).

- "It's conceded, the FCC agrees that intermediate scrutiny applies." Oral Arg. Tr. at 18.

- "I think all the roads lead to Rome here, so to speak. Arbitrary and capricious in its analysis, the First Amendment intermediate scrutiny analysis, and the statute all require the same thing." *Id.*

- "Page 32 of our opening brief, the exclusivity rule, the FCC has acknowledged the order under review is also subject to intermediate scrutiny. The exclusivity ruling poses an onerous burden. We go on and on and on talking about the First Amendment there." *Id.* at 43.

- "The First Amendment challenge is simply this, under intermediate scrutiny the Court cannot affirm unless it finds that the FCC has shown, has borne its burden to show by substantial evidence that there is a non-conjectural problem that requires being solved. This is a standard that is slightly more exacting than the arbitrary and capricious standard, although that standard gets the Court in the same place." *Id.* at 44.

As these many excerpts demonstrate, Cablevision has emphatically argued that we cannot uphold the FCC's exclusivity rule if it violates the First Amendment. Cablevision has relatedly contended that the rule violates the statute's "necessary" standard as construed to conform to the First Amendment. In that regard, Cablevision has invoked the constitutional avoidance canon, which requires courts to refrain from interpreting an ambiguous statute in a way that raises serious constitutional questions. *Cf. Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 466 (1989); *Ashwander v.*

*Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring). We therefore cannot reject Cablevision's challenge to the exclusivity rule without analyzing the contours of the First Amendment. *Cf.* Anthony Vitarelli, *Constitutional Avoidance Step Zero*, 119 YALE L.J. 837 (2010). Notwithstanding Cablevision's arguments, however, the majority opinion proceeds to decide the case in complete isolation from the Constitution's constraints. The majority opinion's statement that it can deny Cablevision's challenge to the exclusivity ban without in any way analyzing the First Amendment's limits is mistaken, in my respectful judgment. I will turn now to analysis of those First Amendment boundaries.

## II

### A

The First Amendment inquiry in this case starts with a description of the video programming industry. Although the industry's structure appears complicated at first glance, it in fact resembles the "three-stage chain of production comprised of manufacturers, wholesalers, and retailers that typifies the distribution of many, if not most, physical goods in the U.S. economy." Christopher S. Yoo, *Vertical Integration and Media Regulation in the New Economy*, 19 YALE J. ON REG. 171, 220 (2002).

The first stage – manufacturing – consists of entities that create video programming, the program producers. That portion of the market is principally populated by those "who create original television programming, as well as syndicators and others who hold the rights to programming that has already been produced." *Id.* at 221.

The second stage of the chain – wholesale – is composed of networks like ESPN, TNT, Disney, and USA, "which acquire the right to air programs and aggregate them into program packages." *Id.* I will refer to these entities as "the video programming networks." It is not uncommon for these firms to engage in both the manufacturing and wholesale aspects of video programming, as networks sometimes produce programs in-house. *Id.* For example, CNN primarily airs news programs of its own making, and ESPN internally produces SportsCenter.

The third stage – retail – consists of businesses competing in the multichannel video programming distributor (or MVPD) market to deliver packages of video programming networks to the homes of consumers. These distributors contract with video programming networks and sell the package of networks as a single service to home consumers. This aspect of the industry was once dominated by cable operators, but today there is widespread competition among firms delivering programming via cable (such as Comcast, Time Warner, Cox, Charter, and Cablevision), satellite (such as DIRECTV and DISH), and fiber-optics (such as Verizon FiOS and AT&T U-verse). I will call these entities "the video programming distributors."

B

In the 1980s, it was common for one monopoly video programming distributor – the local cable operator – to serve an entire geographic area. A few large cable operators had essentially carved up the country into different parts with one cable operator typically exercising monopoly power in each city or area. Because of the exorbitant costs of building a

duplicative cable system (referred to as "overbuilding"), there was little competition among cable operators in the home consumer (i.e. retail) market. And obtaining video from satellite or telephone-line programming distributors was not yet a reality for most consumers. This meant that most home consumers had one and only one choice in a multichannel video programming distributor. The local cable operator ordinarily maintained what was known as a bottleneck monopoly; it possessed not only a huge market share but also the exclusive physical connection for home consumers to obtain multichannel video programming services.

Congress eventually grew concerned about the power possessed by Big Cable – the bottleneck, monopolistic cable operators. And Congress ultimately passed (over the veto of President George H.W. Bush) the Cable Television Consumer Protection and Competition Act of 1992. Pub. L. No. 102-385, 106 Stat. 1460. The new law sought to "ensure that cable television operators" could not exercise "undue market power vis-a-vis video programmers and consumers," and thereby harm competition in the video programming distribution and video programming markets. *Id.* § 2(b)(5), 106 Stat. at 1463. The Cable Act, and the FCC regulations adopted pursuant to it, put forth a variety of measures to constrain the market-dominant cable operators. Some provisions, for example, imposed forced-carriage mandates that in effect required cable operators to carry certain kinds of networks or stations; these were known as must-carry, leased-access, and channel-occupancy requirements.

As relevant here, the 1992 Cable Act also directed the Federal Communications Commission to promulgate rules prohibiting "exclusive contracts" for programming between a cable operator and an affiliated cable programming network.

47 U.S.C. § 548(c)(2)(D). This provision imposed a forced-sharing requirement (also known as a "program access" requirement). It mandated that cable-affiliated programming networks be made available to competitors of cable operators on the same terms they are made available to the affiliated cable operators.[2] As a result, cable programming networks generally cannot refuse to deal with distributors that compete with cable operators in the video programming distribution market.

For example, Comcast partially owns several programming networks, including the MLB Network, E!, Versus, and the Golf Channel. Because Comcast is a cable operator and possesses an attributable interest in those programming networks, the networks must be made available to Comcast's competitors – like DIRECTV, DISH, and Verizon – on the same terms on which they are provided to Comcast.

The exclusivity ban arose out of a simple congressional concern. Cable programming networks that were vertically integrated with bottleneck monopoly cable operators might "simply refuse to sell to potential competitors" in the video programming distribution market, such as emerging "cable operators, satellite dish owners, and wireless cable operators." S. REP. NO. 102-92, at 26 (1991). Instead, cable programming

---

[2] This availability was further ensured by a provision of the 1992 Cable Act that prohibited "discrimination" by a cable-affiliated programming network with respect to "prices, terms, and conditions of sale or delivery" when dealing with unaffiliated programming distributors. 47 U.S.C. § 548(c)(2)(B). When I refer to the operation of the exclusivity ban throughout this opinion, I am referring to it in conjunction with this nondiscrimination requirement.

networks might choose to deal only with their affiliated cable operators. By depriving newly developing programming distributors of key cable programming networks, the cable companies could suppress the emergence of new video programming distributors (like satellite) that might threaten the monopoly of the cable operators. *See* STUART MINOR BENJAMIN ET AL., TELECOMMUNICATIONS LAW AND POLICY 599 application note 1 (2d ed. 2006); Christopher S. Yoo, *Vertical Integration*, 19 YALE J. ON REG. at 185.

The exclusivity ban constituted one part of Congress's effort to counteract the bottleneck monopoly power of cable operators. At the same time, in passing the 1992 Act Congress recognized that the market was not static and that competitive video programming distributors were sprouting. And it acknowledged the bedrock competition principle that exclusive contracts are ubiquitous and beneficial in a competitive market – for example, a market with legitimate competitors to cable operators. The Senate Report pointed out that "exclusivity can be a legitimate business strategy where there is effective competition." S. REP. NO. 102-92, at 28. Therefore, the statute required that the exclusivity ban sunset after 10 years unless the FCC found that it "continue[d] to be necessary to preserve and protect competition and diversity in the distribution of video programming." 47 U.S.C. § 548(c)(5).

In 2002, at the end of the sunset period, the FCC found a continued need for the prohibition and extended it for five years. *Implementation of the Cable Television Consumer Protection and Competition Act of 1992*, 17 F.C.C.R. 12,124, 12,124 (2002) ("2002 Order"). At that time, however, Commissioner Martin termed it a "very close call," and Commissioner Abernathy dissented, stating that "in light of

the significant competitive changes in the marketplace – including the dramatic increase in both competition and availability of programming – and the existence of other provisions that protect competing MVPDs from discriminatory treatment, including [bans on] 'unreasonable refusals to sell,' I cannot find that this provision continues to be necessary to preserve and protect competition and diversity in the delivery of video programming." *Id.* at 12,181, 12,178.

In 2007, the FCC extended the ban for another five years. *Implementation of the Cable Television Consumer Protection and Competition Act of 1992*, 22 F.C.C.R. 17,791, 17,792 (2007) ("2007 Order"). The 2007 Order prompted this case.

## III

The fundamental question here is whether the FCC's continued ban on exclusive contracts between one category of video programming distributors – cable operators – and their affiliated video programming networks violates the First Amendment and the 1992 Cable Act, as construed to conform to the First Amendment.

## A

The Supreme Court has stated that video programming distributors and video programming networks "engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994); *see City of L.A. v. Preferred Communications, Inc.*, 476 U.S. 488, 494 (1986); *FCC v. Midwest Video Corp.*, 440 U.S. 689, 707 (1979).

A video programming distributor (such as Cablevision, DIRECTV, DISH, or Verizon) is constitutionally entitled to exercise "editorial discretion over which stations or programs to include in its repertoire." *Turner*, 512 U.S. at 636 (quoting *City of L.A.*, 476 U.S. at 494). As a result, the Government cannot compel video programming distributors to operate like "dumb pipes" or "common carriers" that exercise no editorial control. The video programming distributors are similar to publishing houses, bookstores, playhouses, movie theaters, or newsstands in the sense that they exercise editorial control in picking the content they will provide to consumers.

Programming networks, such as ESPN, TNT, and CNN, also have a First Amendment right to speak – that is, to develop or purchase original programming and have it distributed as they see fit. *Id.* Programming networks resemble magazines and newspapers. They create and aggregate content to entertain and inform a wide audience. And they choose when and where to sell that content.

The 1992 Cable Act's exclusivity ban implicates the First Amendment rights of both cable operators and cable programming networks.

As to the cable operators, the exclusivity ban dampens their incentives to invest in new or existing programming networks. They might not take the risk and spend the money if they cannot fully reap the fruits of their investment. Similarly, competitors of cable operators may feel less need to invest in new programming networks because they can piggy-back on the cable-affiliated networks. As a result, there may be fewer new video programming networks than there otherwise would be. As this Court has explained, the

resulting reduction in speech (compared to what otherwise would occur) implicates First Amendment interests. *See Time Warner Entm't Co. v. FCC*, 93 F.3d 957, 979 (D.C. Cir. 1996) ("To be sure, because the ability to enter into exclusive contracts could create economic incentives to invest in the development of new programming, prohibiting such contracts might result in reduced programming – that is, less speech."); *cf. Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004) ("Compelling . . . firms to share the source of their advantage . . . may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities."); *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 428-29 (1999) (Breyer, J., concurring in part and dissenting in part) ("a sharing requirement may diminish the original owner's incentive to keep up or to improve the property by depriving the owner of the fruits of value-creating investment, research, or labor"); *U.S. Telecom Ass'n v. FCC*, 290 F.3d 415, 429 (D.C. Cir. 2002) ("mandatory unbundling comes at a cost, including disincentives to research and development").

As to cable programming networks, the exclusivity prohibition forces them to sell to video programming distributors when they might otherwise choose not to do so. This forced-sharing mandate poses a First Amendment issue because the right of a First Amendment-protected editor or speaker *not* to speak and associate "serves the same ultimate end as freedom of speech in its affirmative aspect" and is entitled to similar constitutional protection. *Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 11 (1986) (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 559 (1985)); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988) ("The First Amendment mandates that we presume that

speakers, not the government, know best both what they want to say and how to say it."); *Wooley v. Maynard*, 430 U.S. 705, 713 (1977). "For corporations as for individuals, the choice to speak includes within it the choice of what not to say." *Pacific Gas*, 475 U.S. at 16 (citing *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)).

To be sure, the exclusivity ban's interference with the First Amendment interests of cable operators and programming networks is considered content-neutral, meaning that it is subject to intermediate rather than strict scrutiny. *Turner*, 512 U.S. at 662. But intermediate scrutiny is still tough scrutiny, not a judicial rubber stamp. To pass muster, the ban must further "an important or substantial governmental interest" and the restriction must be "no greater than is essential to the furtherance of that interest." *Id.* (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). The Government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 664 (plurality opinion). In applying this standard, the usual deference afforded legislative or agency findings "does not foreclose our independent judgment of the facts bearing on an issue of constitutional law." *Id.* at 666 (quoting *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989)) (internal quotation marks omitted).

B

After enactment of the 1992 Cable Act, cable companies brought facial First Amendment challenges to many of its provisions, including the exclusivity ban. In 1996, this Court held that the ban on exclusive contracting by vertically integrated cable operators and programmers did not on its

face violate the First Amendment. *Time Warner*, 93 F.3d at 979. Upholding this restriction on speech as necessary to further the Government's interest in fair competition, we specifically relied on the "special characteristics" of the cable industry at the time, including "the bottleneck monopoly power exercised by cable operators, and the unique power that vertically integrated companies have in the cable market." *Id.* at 978 (quoting *Turner*, 512 U.S. at 661) (internal quotation marks omitted). But as I will explain, the relevant facts that we relied on in *Time Warner* no longer exist, and *Time Warner*'s facial ruling therefore does not control this as-applied challenge. *See Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005).

The major change since our 1996 *Time Warner* decision is that cable operators no longer possess bottleneck monopoly power in the video programming distribution market in any geographic area in the continental United States. As we recently explained in *Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009), home consumers can obtain service from the local cable operator, DIRECTV, DISH, and in many places Verizon FiOS and AT&T as well. Providers of programming on the Internet – like Hulu, YouTube, iTunes, and Apple TV – also increase competition in the market. Indeed, it seems plausible that traditional video programming viewed on television and video programming viewed over the Internet will soon merge in many households. Based on a careful assessment of the market in our recent *Comcast* decision, we definitively concluded that cable operators "no longer have the bottleneck power over programming that concerned the Congress in 1992." *Id.* at 8. For that reason, we vacated the FCC's longstanding 30 percent cap on how many video programming subscribers an individual cable operator could serve nationwide.

Given the difficulty in justifying the exclusivity ban in light of the aggressive competition in today's video programming distribution market, the FCC also points to alleged impediments to competition among video programming networks, claiming that some networks are "must-have." This is an odd argument because no video programming network comes close to possessing market power. In 1992, there were 68 national programming networks, and 57 percent of them were vertically integrated with cable operators. By 2007, there were well over 500 national programming networks, and only 22 percent of them were vertically integrated with a cable operator. In a market with well over 500 national programming networks, it is nearly impossible (and would make a mockery of textbook antitrust and free speech principles) to say that any one national network is the equivalent of an essential facility – a must-have network that the Government can thereby compel the cable company to share with all other video programming distributors.[3] Moreover, the flaw in the theory runs even

---

[3] In this regard, it is also important to appreciate that the market for video programming networks generally "is national in scope" and nationally competitive. Christopher S. Yoo, *Vertical Integration and Media Regulation in the New Economy*, 19 YALE J. ON REG. 171, 227 (2002). Therefore, even though large cable operators like Time Warner, Comcast, Cox, Charter, and Cablevision often do not compete with each other in the downstream market for in-home consumers, they do compete with each other in the upstream market to purchase rights to carry national video programming networks. And in both the upstream and downstream markets, they compete against other video programming distributors like DIRECTV, DISH, Verizon, and AT&T. So if Comcast wanted to enter into an exclusive contract with ESPN, Comcast presumably would have to compete against

deeper because any supposed must-have consumer preferences typically relate to programs not networks. And other than certain live sports events, *see infra* n.6, the popularity of these programs often shifts rapidly, transforming today's must-have into tomorrow's has-been.

This radically changed and highly competitive marketplace – where no cable operator exercises market power in the downstream or upstream markets and no national video programming network is so powerful as to dominate the programming market – completely eviscerates the justification we relied on in *Time Warner* for the ban on exclusive contracts. One of the leading scholars on communications law concluded eight years ago "that the restrictions on vertical integration in the cable industry

---

all the members of the video programming distributor market – all the other cable operators such as Time Warner, Cox, Charter, and Cablevision, as well as DIRECTV, DISH, Verizon, and AT&T. In other words, in the upstream national market for purchase of nationally available video programming networks, it does not make much sense to talk about the power of cable versus satellite; it instead makes more sense to talk about the relative power of individual firms – Comcast, DIRECTV, DISH, Time Warner, Cox, Charter, Cablevision, Verizon, AT&T, and others. The largest of those firms – Comcast – serves only about 25 percent of the consumers who obtain service through a multichannel video programming distributor. In such a market, the video programming networks usually have little incentive to limit their networks to only one distributor. And programming producers in turn often have little incentive to limit their shows to a network that will not sell nationally to a distributor that reaches all home consumers. For that reason, this case may be a tempest in a teapot: It seems unlikely that the market would yield that many high-profile exclusive arrangements because they likely would not be profitable for the relevant parties.

enacted by the 1992 Cable Act are not economically justified." Christopher S. Yoo, *Vertical Integration*, 19 YALE J. ON REG. at 226; *see also* Christopher S. Yoo, *Network Neutrality, Consumers, and Innovation*, 2008 U. CHI. LEGAL F. 179, 183 ("coordination of content and conduit through vertical integration or contractual exclusivity generally benefits consumers"). That conclusion is even more correct in the year 2010. The Government can no longer show that the ban on exclusive contracts furthers the interest in fair competition.

C

To be sure, some might contend that exclusive vertical contracts are a problem even in a competitive market – that is, even in this market with several vibrant video programming distributors and hundreds of national programming networks. But such an argument flouts well-settled American antitrust principles. *See* 3B PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 755a, at 6 (3d ed. 2008) ("To be sure, even competitively harmless vertical integration can injure rivals or vertically related firms, but such injuries are not the concern of the antitrust laws."); *cf. Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 882 (2007) (recognizing the pro-competitive effects of vertical relationships); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 54-55 (1977) (identifying the market benefits of vertical combinations such as the promotion of interbrand competition).

Exclusivity agreements are ubiquitous in all sectors of the economy. For example, Apple and AT&T maintain an exclusive agreement with respect to service for the iPhone, Walt Disney and Wal-Mart have an exclusive agreement for

the sale of Hannah Montana-themed clothing, and DIRECTV and the National Football League have an exclusive agreement for distribution of the full slate of NFL games. *See* Andria Chang, *Retailers Seek More Exclusives*, WALL ST. J., July 2, 2008, at B5A.

At least unless a company possesses market power in the relevant market, vertical integration and exclusive vertical contracts are not anti-competitive; on the contrary, such arrangements are "presumptively procompetitive." 11 HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1803, at 100 (2d ed. 2005).[4] Exclusive agreements can benefit consumers by strengthening a business's incentives to innovate and invest, to create new products, and to differentiate its products from its competitor's products. If parties who have not shared the risks are able to come in as equal partners on a successful investment, and avoid payments for losses, the incentive to invest declines. Indeed, the FCC itself has recognized this fundamental economic principle, as has Congress.[5]    In

---

[4] *See* 3B AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 755a, at 9 ("Without substantial market power at any relevant production or distribution stage, vertical integration . . . . is either competitively neutral or affirmatively desirable."); ROBERT H. BORK, THE ANTITRUST PARADOX 309 (1978) ("The truth appears to be that there has never been a case in which exclusive dealing or requirements contracts were shown to injure competition.").

[5] The Seventh Circuit has recognized the competitive benefits of exclusivity arrangements in the newspaper industry in terms that are instructive: "A market in which every newspaper carried the same stories, columns, and cartoons would be a less vigorous market than the existing one. And a market in which the creators of intellectual property (such as the *New York Times*) could not decide how best to market it for maximum profit would be a market with less (or less interesting) intellectual property created in the first

renewing the exclusivity ban in 2007, the FCC recounted "the benefits of exclusive contracts and vertical integration . . . such as encouraging innovation and investment in programming and allowing for 'product differentiation' among distributors." 2007 Order at 17,835. And when enacting the 1992 Cable Act, the Senate recognized that "exclusivity can be a legitimate business strategy where there is effective competition." S. REP. NO. 102-92, at 28 (1991).

Because both the video programming distributor market and video programming network market are competitive, a ban on exclusive vertical contracts does not serve the Government's interest in competition; if anything, it thwarts that interest. The FCC's exclusivity ban therefore fails the intermediate scrutiny test, and its infringement on the editorial and speech rights of cable operators and cable programmers cannot be squared with the First Amendment.[6]

---

place. No one can take the supply of well researched and written news as a given; legal rulings that diminish the incentive to find and explicate the news (by reducing the return from that business) have little to commend them." *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996). The same can be said of the video programming distribution market – forbidding exclusive agreements may result in more homogeneous, less diverse, and less competitive video programming.

[6] In so concluding, it bears emphasis that First Amendment editors and speakers remain subject to generally applicable laws, including the antitrust laws that prohibit certain anti-competitive behavior. Moreover, I would leave open the possibility that the Government might still impose a prospective ban on some exclusive agreements between video programming distributors and affiliated *regional* video programming networks, particularly regional sports networks. That is because the upstream market in which video programming distributors contract with *regional* networks is less competitive than the national market: There may be

24

IV

The FCC's exclusivity ban fails because it no longer serves an important government interest and it burdens more speech than essential to achieve its aims. But even if the Government were justified in maintaining a ban on exclusive contracts, it would have to do so even-handedly to satisfy the First Amendment. The FCC's exclusivity rule also fails that bedrock equal-treatment requirement.

The exclusivity prohibition, by its text, applies only to cable operators that have an attributable interest in a programming network. 47 U.S.C. § 548(c)(2)(D). Because the ban governs only cable operators and not DIRECTV, DISH, Verizon, or AT&T, the rule discriminates among similarly situated video programming distributors and video programming networks. Programming networks that are affiliated with cable operators must share their content with other operators, whereas those that are affiliated with satellite companies (such as DIRECTV or DISH) or with Verizon or AT&T may refrain from doing so.

---

only a few video programming distributors in the market to purchase regional programming networks, and market share and other relevant factors in certain areas may dictate tolerance of a narrow exclusivity ban. Situations where a highly desirable "must have" regional sports network is controlled by one video programming distributor might justify a targeted restraint on such regional exclusivity arrangements. I need not definitively address such a possibility in this case. In any event, *regional* concerns of this sort cannot serve as the justification for the FCC's draconian and vastly overbroad *national* ban. It is telling, in that regard, that the FCC has pointed to regional sports networks as the primary justification for this national ban.

Indeed, DIRECTV and DISH, which are the second- and third-largest video programming distributors nationally and together serve over 30 percent of in-home video programming consumers, are not subject to the FCC's exclusivity ban. But Cablevision, which now is the seventh-largest national video programming distributor, is subject to the ban. What justification is there for such discrimination against a less powerful entity? None – or at least none that the FCC has provided. It bears mention, moreover, that this discrimination against certain video programming distributors was not a considered legislative decision; it is simply an unintended relic of the far different video programming distributor market that existed in 1992 when Congress passed the Cable Act.

This discrimination raises significant First Amendment issues. As the Supreme Court has said, "[r]egulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 659 (1994); *see Leathers v. Medlock*, 499 U.S. 439, 448 (1991) (regulations that discriminate among speakers threaten to "distort the market for ideas"); *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (laws discriminating among speakers must be "justified by some special characteristic" of the speaker). In fact, "restrictions distinguishing among different speakers, allowing speech by some but not others" are frequently found constitutionally invalid. *Citizens United v. FEC*, No. 08-205, slip op. at 24 (U.S. Jan. 21, 2010).

The question, therefore, is whether a substantial government interest supports the discriminatory treatment. *See Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434, 1450-51 (D.C. Cir. 1985). In my judgment, the answer is no. The

competitive conditions of the market can no longer justify imposing this restriction on the speech of cable operators and cable programmers, but not on video programming distributors and video programming networks that provide the same services through the use of other technologies. "[D]ifferential treatment" of this sort "cannot be squared with the First Amendment." *Citizens United*, No. 08-205, slip op. at 37.

If the Government is to impose an exclusivity ban, it must apply it in an even-handed manner to similarly situated video programming distributors, or it must articulate a substantial government interest for any discriminatory treatment. The Government has not done so here. For that alternative reason as well, the FCC's exclusivity ban violates the First Amendment.

V

In conclusion, I briefly offer a few additional observations.

First, the lag time for Congress and a regulatory agency to catch up to the realities of a changing market ordinarily would not be cause for much judicial concern. Congress has the constitutional authority to enact and update competition laws, and executive and independent agencies may adopt and change competition rules as they reasonably see fit within the bounds specified by Congress. Neither *Lochner*-style substantive due process analysis nor its statutory first cousin – overly aggressive APA arbitrary and capricious review of agency rules – is an appropriate tool for courts to employ in ordinary economic regulation cases. *See American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 247-48 (D.C. Cir.

2008) (Kavanaugh, J., concurring in part and dissenting in part).

But this is not just another economic regulation dispute; it is a First Amendment case. The First Amendment contemplates a more "laissez-faire regime." *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 161 (Douglas, J., concurring in the judgment). It greatly limits the Government's ability to interfere with speech in communication markets – as compared to the Government's power to regulate, for example, energy, labor relations, the environment, or securities transactions.

Second, some claim that the exclusivity ban has been effective in achieving competition, so why not continue it? Even accepting arguendo the premise, the argument reflects a misunderstanding of the interaction of competition principles and the First Amendment. When a speech market is not competitive, content-neutral government intervention may sometimes be permissible. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 647 (1994). But when a market is competitive, direct interference with First Amendment free speech rights in the name of competition is typically unnecessary and constitutionally inappropriate. That is particularly true in this case because antitrust law tells us that vertical integration and exclusive vertical contracts may actually further competition and consumer welfare when, as here, the market has become competitive.

Third, some contend that the greatest threat to free speech today comes from private entities not from the Government. Whatever the merits of that argument as a philosophical matter, the First Amendment is a restriction on *governmental* power. *Columbia Broad. Sys., Inc.*, 412 U.S. at 114 (plurality

opinion). The First Amendment is not an authorization for the Government to restrict the speech of some so as to enhance or equalize the influence of others. Indeed, the Supreme Court has described such a theory as "wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 49 (1976).

Fourth, it is entirely understandable that the FCC wants to ensure that consumers can view certain programming networks no matter whether they choose cable, DIRECTV, DISH, Verizon, AT&T, or some other distributor. But a governmental desire that every programming distributor carry the same networks can no more justify interference with Cablevision's First Amendment rights than it could justify the Government telling Barnes & Noble what publisher's books it had to sell, or telling a bookstore-affiliated publishing company that it had to make certain books available to all bookstores, or telling a movie production company what theaters it had to contract with in selling its movie, or telling the *Washington Post* that its best political columnist or reporter had to be shared with other competing newspapers. I readily concede that the First Amendment rights of a Cablevision or ESPN do not tug at the free speech heartstrings in the same way as the iconic political protester who lies at the core of the First Amendment. But if video programming distributors are like bookstores and movie theaters and newsstands – and the Supreme Court has repeatedly and emphatically said they are – we cannot brush aside the vital First Amendment interests at stake here.

Fifth, I respect the FCC's well-intentioned efforts to navigate this difficult issue. The FCC is often between a rock and a hard place in deciding the right time to loosen restrictions adopted as a result of the 1992 Cable Act, and in

exercising its other critical responsibilities. I have no question about the FCC's good faith in seeking to discharge its duties and to achieve legitimate policy objectives.

That said, courts occupy a different place in the constitutional architecture. If by our best lights we conclude that a law or regulation violates the First Amendment as the Amendment has been interpreted by the Supreme Court, then it is our duty to so rule, notwithstanding the good intentions of the political branches or the legitimacy of the policy goal. *See United States v. Eichman*, 496 U.S. 310, 316-19 (1990); *Texas v. Johnson*, 491 U.S. 397, 420-21 (1989) (Kennedy, J., concurring). When asked to uphold First Amendment free speech rights, the courts must exercise their independent constitutional judgment, not abdicate that responsibility to the political branches. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 155-62 (1803); THE FEDERALIST NO. 78.

\* \* \*

I would hold that the FCC's exclusivity rule violates the First Amendment and therefore also violates the 1992 Cable Act as construed to conform to the First Amendment. I respectfully dissent.